UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
_____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| PATRICK CHURCHVILLE, ) | |
| CLEARPATH WEALTH MANAGEMENT, LLC ) | |
| ) | **JURY TRIAL DEMANDED** |
| Defendants, ) | |
| and ) | |
| ) | |
| CLEARPATH MULTI-STRATEGY FUND I, L.P. ) | |
| CLEARPATH MULTI-STRATEGY FUND II, L.P. ) | |
| CLEARPATH MULTI-STRATEGY FUND III, L.P. ) | |
| HCR VALUE FUND, L.P. ) | |
| ) | |
| Relief Defendants. ) | |

_____

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges

the following against Defendants Patrick Churchville ("Churchville"), ClearPath Wealth

Management, LLC ("ClearPath"), and Relief Defendants ClearPath Multi-Strategy Fund I, L.P.,

ClearPath Multi-Strategy Fund II, L.P., ClearPath Multi-Strategy Fund III, L.P., and HCR Value

Fund, L.P. (collectively, the "Relief Defendants"), and hereby demands a jury trial:

## SUMMARY OF THE ACTION

1.       Beginning in December 2010, private fund manager Patrick Churchville, through

his firm ClearPath Wealth Management, misappropriated and misused his investors' cash and

assets through a years-long fraudulent scheme involving theft, covered up by false accounting

entries, shadow accounts, and misrepresentations to his investors, as well as to financial institutions, to third-party administrators, and to ClearPath's auditors and accountants.

2.      Relief Defendants, ClearPath Multi-Strategy Fund I, L.P. ("MSF I"), ClearPath Multi-Strategy Fund II, L.P. ("MSF II"), ClearPath Multi-Strategy Fund III, L.P. ("MSF III") (collectively, the "Funds"), and HCR Value Fund, L.P. ("HCR Value") are private funds managed by Churchville and ClearPath.  Defendants used these funds as vehicles for their fraudulent scheme.

3.      ClearPath and Churchville caused at least $11 million in losses to the Funds they advised and controlled, by misappropriating the funds' cash in a series of Ponzi-like transactions. They misallocated and misappropriated investor assets, using monies that were due to be distributed to particular investors to pay for new investments or to fund distributions to unrelated investors.  They further misallocated and misappropriate investor funds by using fund assets to secure undisclosed borrowing and by repaying the borrowed funds with monies that were due to be distributed due to investors.  In addition, and most egregiously, ClearPath and Churchville stole approximately $2.5 million of investors' funds to purchase Churchville's home overlooking Narragansett Bay.

4.      Churchville and ClearPath engaged in a series of deceptive acts and fraudulent accounting entries to conceal their thefts and misappropriation from auditors, accountants, fund administrators and ClearPath staff.

5.      When Fund investors requested distributions of their investments in September 2013, Churchville prolonged the scheme by lying to investors about the status, worth and disposition of those investments, lulling investors.

6.      Through the activities alleged in this Complaint, Defendants have engaged in:

    a.   fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder;

    b.   fraud in the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act");

    c.   fraudulent conduct by an investment adviser, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"); and,

    d.   fraudulent conduct by an investment adviser to a pooled investment vehicle, in violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

7.   Additionally, ClearPath has failed to:

    a.   comply with rules promulgated under the Advisers Act related to the custody of funds or securities of clients, in violation of Section 206(4) of the Advisers Act and Rule 206(4)-2 thereunder; and,

    b.   adopt, implement, and annually review written policies and procedures reasonably designed to prevent violation, by ClearPath and ClearPath's supervised persons, of the Advisers Act and the rules promulgated under the Advisers Act, in violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder.

8.   Churchville has also aided and abetted ClearPath's violations of Section 206(4) of the Advisers Act and Rules 206(4)-2 and 206(4)-7 promulgated thereunder.

9.      To halt the Defendants' ongoing unlawful conduct, maintain the status quo, and preserve any remaining assets for defrauded investors before entry of a final judgment, the Commission seeks emergency equitable relief, including a preliminary injunction, to:

      a.   prohibit Defendants from continuing to violate the relevant provisions of the federal securities laws;

      b.   freeze all assets held for the benefit the Defendants and the Relief Defendants and/or subject to their direct control and otherwise maintain the status quo;

      c.   require Defendants to submit an accounting of investor funds and all other assets in their possession;

      d.   prohibit Defendants from soliciting or accepting additional investments;

      e.   prevent Defendants and Relief Defendants from destroying relevant documents;

      f.   appoint a receiver over Defendants and Relief Defendants pursuant to Federal Rule of Procedure 66; and,

      g.   authorize the Commission to take expedited discovery.

10.      The Commission also seeks

      a.   entry of a permanent injunction prohibiting Defendants from further violations of the relevant provisions of the federal securities laws;

      b.   an order permanently restraining and enjoining Churchville from participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account;

      c.   disgorgement of Defendants' ill-gotten gains, plus pre-judgment interest;

      d.   disgorgement by the Relief Defendants of all unjust enrichment and/or ill-gotten gain received from Defendants, plus prejudgment interest; and,

      e.   imposition of civil penalties due to the egregious nature of Defendants' violations.

## JURISDICTION AND VENUE

11.     The Commission seeks a permanent injunction and disgorgement pursuant to

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act

[15 U.S.C. § 78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].  The

Commission seeks the imposition of a civil penalty pursuant to Section 20(d) of the Securities

Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and

Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)].

12.     The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of

the Securities Act [15 U.S.C. §§ 77t(d), 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange

Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa], and Sections 209(d), 209(e) and 214 of the Advisers

Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

13.     Venue is proper in this District because, at all relevant times, ClearPath

maintained offices in Rhode Island and Churchville maintained a residence in Rhode Island.

14.     In connection with the conduct described in this Complaint, Defendants directly

or indirectly made use of the mails or the means or instruments of transportation or

communication in interstate commerce.

15.     Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of

regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to

other persons.

## DEFENDANTS

16.     **Patrick Churchville ("Churchville")**, age 46, lives in Barrington, Rhode Island.

He is the sole owner and President of ClearPath.  In that capacity, he has served as an investment

adviser to individual clients and to pooled investment vehicles, and has engaged in the business of directly or indirectly advising others as to the value of securities and/or as to the advisability of investing in, purchasing, or selling securities.

17.    **ClearPath Wealth Management, LLC**, ("ClearPath"), an investment adviser licensed by the State of Rhode Island and is a Rhode Island limited liability corporation with its principal place of business in Barrington, Rhode Island.  ClearPath was registered with the Commission as an investment adviser from January 3, 2008 through November 16, 2012, at which time ClearPath became an investment adviser registered with the state of Rhode Island. ClearPath's change of registration corresponded with changes in the minimum levels of assets under management required for investment advisers registered with the Commission.  According to its Form ADV filed with Rhode Island in April 2013, ClearPath is the manager of several limited liability companies ("LLCs") which are the general partners of four affiliated private funds:  the Multi-Strategy I, Multi-Strategy II, Multi-Strategy III (collectively herein, the "Funds") and the HCR Value Fund (defined below).  ClearPath is also the adviser to the Funds and to the HCR Value Fund, pursuant to management agreements between ClearPath and each of the funds.

### RELIEF DEFENDANTS

18.    **ClearPath Multi-Strategy Fund I, L.P.** ("MSF I"), formerly known as ClearPath Private Equity Fund, L.P., is a Delaware limited partnership formed in 2008.

19.    **ClearPath Multi-Strategy Fund II, L.P.** ("MSF II") is a Delaware limited partnership formed in 2011.

20.     **ClearPath Multi-Strategy Fund III, L.P.** ("MSF III"), formerly known as the ClearPath Healthcare Receivables Investments Fund L.P., is a Delaware limited partnership formed in 2009.

21.     **HCR Value Fund, L.P.** ("HCR Value") is a Delaware limited partnership formed in 2012.

## FACTUAL ALLEGATIONS

### A.  STRUCTURE OF THE CLEARPATH FUNDS

22.     Starting at least in 2008, Churchville and ClearPath managed a series of private investment funds that were structured as limited liability partnerships

23.     According to its Form ADV filed with Rhode Island in April 2013, ClearPath is the adviser to at least four affiliated private funds, pursuant to management agreements between ClearPath and each of the funds:  ClearPath Multi-Strategy I, LLC; ClearPath Multi-Strategy II, LLC; ClearPath Multi-Strategy III, LLC; and HCR Value Fund GP, LLC.

24.     **ClearPath Multi-Strategy I, LLC** is the general partner of the MSF I fund. Until November 2011, the MSF I was named the ClearPath Private Equity Fund, LP.

25.     **ClearPath Multi-Strategy II, LLC** is the general partner of MSF II.

26.     **ClearPath Multi-Strategy I, LLC** is the general partner of MSF III.  Until November 2011, MSF III was named the ClearPath Health Care Receivables Investments Fund, L.P.

27.     **HCR Value Fund GP, LLC** is the general partner of HCR Value.

28.     MSF I, MSF II, and MSF III retained ClearPath to provide investment advice, in exchange for management fees, expense reimbursement, placement fees and, in the case of MSF III, a success fee.

29.     Investors in each of the private funds held limited partnership interests in those funds.  As such, the investors are limited partners in the funds, pursuant to Limited Partnership Agreements ("LPAs") between the limited partners and the funds.

30.     ClearPath and Churchville organized the Funds and HCR Value in a complex Series structure.  Fund managers use a Series structure to offer different "Series" of shares or interests within a fund.  Each Series generally has the same partnership rights in the fund, but may have different investment dates, different asset values, and often different assets.

31.     The LPAs for each Fund provide that Fund assets and capital are divided into separate Series, which in turn are accounted for as sub-partnerships within the Fund.

32.     In practice, each Series in the ClearPath funds was comprised of a distinct portfolio investment, and investors subscribed specifically to the particular Series in which they wanted to invest.

33.     Because each Series within the Funds was supposed to be accounted for as a separate sub-partnership, ClearPath provided investors with capital account statements specific to their Series, rather than to the Fund overall.  Distributions attributable to redemption of the portfolio investment associated with a particular Series were to be made only to those investors participating in those Series, in proportion to their respective investments.  Investors were to receive distributions or other funds only from their interest in the Series, as opposed to the Fund overall.  In essence, the investors owned investments in particular portfolio companies, while the

portfolio companies were administered under the umbrella of the overall Fund, which paid ClearPath its management fees and other compensation.

34.     ClearPath and Churchville, through the Funds, offered Series in a variety of different types of investments, including commercial secured loans, collections of other private funds, direct investments in private companies, and an investment in publicly traded equities and bonds (held in a brokerage account at Oppenheimer & Co).

## B.  DEFENDANTS' SCHEME TO MISAPPROPRIATE INVESTOR ASSETS

### i.     Overview of Defendants' Fraudulent Scheme

35.     Defendants misappropriated investor funds from the funds they managed and used some of the misappropriated funds to cover various business and personal expenses.  Defendants frequently transferred cash from one fund to another, or from the Funds to ClearPath's bank account, to cover these expenses. At other times, Defendants would borrow against the Funds' assets and investments, using the borrowed funds to bankroll their business and personal expenses and investments held by ClearPath for the benefit of the Defendants.  When such investments proved profitable, Defendants the profits for themselves.  When the investments lost money, however, Defendants used monies that were owed to Fund investors to repay the loans.

36.     Defendants' repeated diversions of Fund monies from their proper purposes left the Funds constantly short of money. Defendants used money from other investors to cover these holes.  Defendants used money misappropriated from other Funds and investments to pay business expenses and to make redemption payments to investors who demanded their money back.

9

37.     To perpetuate their scheme and avoid discovery, Defendants engaged in a constant stream of fraudulent misrepresentations and omissions to investors, prospective investors, ClearPath staff, Fund accountants and administrators, and investment entities.

38.     Once Defendants could no longer conceal the fact that millions of dollars were missing from the Funds, they misrepresented and fraudulently omitted facts concerning why the funds were missing, and their intention and ability to pay them back.  In doing so, Defendants lulled investors into thinking that at least a portion of their investments were intact, when, in fact, the money was gone.

### ii.     Defendants Misappropriated Funds from the Managed Futures Investment

39.     In December 2010, Churchville and ClearPath diverted approximately $1.6 million in proceeds from the redemption of an investment made as a Series in the MSF III fund through a series of unauthorized transfers.  This Series was called "Managed Futures" and consisted of an investment by ClearPath with two commodities futures managers.

40.     ClearPath and Churchville caused MSF III to redeem the Managed Futures Series investment in November 2010.  Proceeds from the redemption totaled approximately $6.6 million and were received by MSF III on December 22, 2010.

41.     Instead of distributing the full $6.6 million in proceeds to the investors in the Managed Futures Series, Churchville and ClearPath diverted $1.6 million for their own uses through a series of unauthorized transfers.

42.     Between December 23, 2010 and January 13, 2011, without authorization or authority, Churchville and ClearPath transferred approximately $600,000 from MSF III's bank

account ending in x5672 at Bank of American to ClearPath's main operating bank account ending in x2978 at Bank of America.

43.     Using the funds from this unauthorized transfer, ClearPath and Churchville then paid various ClearPath expenses, including payroll and fees for accountants, valuation consultants, attorneys, and the Funds' administrator.

44.     Churchville and ClearPath also transferred $30,000 of the $1.6 million to Churchville's personal accounts between December 29, 2010 and January 3, 2011.  These payments to Churchville were recorded as capital distributions from ClearPath.

45.     None of these payments could have been made by ClearPath without the unauthorized transfers, as the prior balance in the ClearPath main operating account was less than $16,000.  In other words, there was not sufficient money in the ClearPath operating fund to cover these expenses without the Churchville misappropriating from the Managed Futures Series redemption

46.     This transfer violated the Management Agreement between ClearPath and the MSF III, because ClearPath was to pay certain of those fees from its management fee.  MSF III recorded certain of the transfers to ClearPath as a receivable due from ClearPath, even though the Management Agreement does not appear to permit loans from the Funds to ClearPath, and ClearPath does not appear to have repaid MSF III.  This withdrawal is also not consistent with the Management Agreement, under which ClearPath was to receive a management fee of 1.5% of the total capital contributions made by each Series paid in four quarterly installments.

47.     ClearPath and Churchville also used approximately $980,000 of funds from the Managed Futures Series redemption to invest in a Rhode Island-based pharmaceutical product incubator fund (the "Incubator Fund").  While Managed Futures Series investors' money was

used for this investment, the investment was not allocated to them or credited to their accounts in any way.  Nor was it credited to any Series or investors in the MSF I fund.  Instead, the investment was marked in ClearPath's books as "unallocated," which enabled ClearPath and Churchville to fraudulently hold this investment for their own benefit and/or for later sale to other investors.

48.     In January 2011, ClearPath and Churchville distributed approximately $4.9 million to the Managed Futures Series investors.  They did not disclose to these investors that this distribution was substantially less than the actual amount received for the redemption of the Managed Futures Series.  Nor did they disclose that they had spent the remaining redemption proceeds as detailed above.

49.     These actions caused an approximately $1.6 million deficit in the proceeds due to Managed Futures Series investors.

50.     To conceal their misappropriation from the MSF III fund, in July 2011, ClearPath and Churchville raised money from new investors to fund what they represented to the new investors was a $2 million healthcare receivables-related investment Series in the MSF III fund.  Instead of using these funds to invest in the healthcare receivables-related investment, they used $1.6 million of the cash received from new investors to pay the remaining distributions due to the Managed Futures Series investors.  No disclosure was made to the new investors regarding the diversion of their investment money.  The use of newly-raised money to fund distributions to earlier investors is typical of the behavior of those engaged in a Ponzi-like scheme.

      **iii.**    **Defendants Misappropriated Funds from an Oppenheimer Investment; Churchville Used the Investors' Money to Purchase His House**

51.      When Churchville and ClearPath diverted the $1.6 million from the funds raised for the purported healthcare receivables-related investment series in the MSF III fund to distribute to Managed Futures Series investors, they plugged one hole but created another.  This led to another series of misrepresentations to a new set of investors.  In the summer of 2011, Churchville and ClearPath began soliciting investors for the "Oppenheimer Public Markets Series," in the MSF I fund.  This investment was marketed to investors as an investment in a balanced portfolio of publicly-traded equities and bonds.  Churchville and ClearPath raised approximately $4.9 million for this "OPCO" Series.

52.      Instead of investing that money as they had represented, Churchville and ClearPath diverted:  (a) approximately $2.5 million to buy a house for Churchville; and (b) an additional $1.6 million to fund the MSF III healthcare receivables-related investment described above.

53.      In addition to this direct misappropriation of investor funds, Churchville and ClearPath found another way to defraud the investors in the OPCO Series.  On or about July 28, 2011, Churchville and ClearPath opened brokerage accounts at Oppenheimer & Co. ("Oppenheimer"), an investment bank and full-service investment firm.  Two of the accounts were opened in the name of MSF I and one was opened in the name of ClearPath Multi-Strategy Fund I LLC, the general partner of the MSF I fund, which was wholly owned and managed by ClearPath.  Oppenheimer documentation for the general partner account and one of the MSF I accounts indicated that these were "shadow" or "clone" accounts of the original account (hereinafter, the "shadow accounts").

13

54.     MSF I established and funded an account with Oppenheimer & Co. in August 2011 shortly after Churchville sent an email to investors about a new opportunity to invest in "publicly traded stocks and bonds."  Churchville circulated a portfolio strategy document created for ClearPath by a director at Oppenheimer.  The document indicated that the historical application of the strategy was less volatile and more profitable than the S&P 500 and Russell 2500 indices

55.     Churchville did not, as promised, invest in a balanced portfolio of publicly traded securities.  Instead, he placed 100% of the funds into government agency bonds and short-term U.S. Treasury bonds.  Neither Churchville nor ClearPath disclosed the change in investment strategy to the OPCO Series limited partners of MSF I.

56.     Churchville and ClearPath then misused and misappropriated the MSF I OPCO Series investors' money.  Using the low-risk bonds as collateral, Churchville used the "shadow accounts" to borrow against the investors' assets to the maximum allowed by Oppenheimer.

57.     On August 12, 2011, the same day that ClearPath deposited the investor funds in the main MSF I Oppenheimer account, Churchville borrowed $2.5 million from Oppenheimer by taking a margin loan against the OPCO Series bond investments.  While Churchville took this money for his own purposes, the margin loan obligated the OPCO Series investors to repay the loan from their investments.

58.     The loan proceeds were not received by the fund.  Instead they passed through the Oppenheimer account that had been opened under the name of the general partner entity, and were then deposited into ClearPath's main operating bank account.

59.     Statements for the "shadow" account reflected the $2.5 million loan on August 12, 2011.  Churchville instructed Oppenheimer to transfer the $2.5 million to the MSF I general

14

partner's Oppenheimer account.  On the same day, these funds were transferred to the ClearPath Multi-Strategy I LLC account ending in x3171 and immediately paid by wire to ClearPath's main operating account at Bank of America.

60.    On the same day, approximately $2.3 million of the money that had been funneled through the OPCO shadow accounts to ClearPath's bank account was paid directly to a real estate title company for the purchase of Churchville's personal residence overlooking Narragansett Bay in Barrington, Rhode Island.  Churchville's house purchase closed on or about August 15, 2011.

61.    On August 31, 2011, ClearPath and Churchville further defrauded their investors by borrowing an additional $1.6 million through a margin loan secured by the OPCO investment. The margin loan obligated the OPCO Series investments, but was used by Churchville and ClearPath to cover up their prior misappropriation of money from an unrelated fund.

62.    Similar to the $2.5 million loan above, the $1.6 million loan proceeds were also not received by MSF I, but were again passed through the general partner's Oppenheimer account, and then deposited into ClearPath's main operating bank account on August 31, 2011. On September 2, 2011, ClearPath and Churchville transferred approximately $1.6 million of the loan proceeds from ClearPath's main operating account to MSF III's bank account ending in x5672 at Bank of America.   These funds were immediately used to pay for a portion of the investment in healthcare-related receivables that ClearPath and Churchville had promised investors in MSF III their money would be used for, before ClearPath and Churchville had diverted their money in July 2011.

63.    At that time, neither Churchville nor ClearPath informed investors that Churchville had: (a) failed to invest their money in a balanced portfolio of publicly traded

15

securities; or (b) margined the investments he did make; or (c) used the proceeds of those margin loans for his personal use and for the benefit of ClearPath.

64.     Beginning in November 2011, OPCO representatives repeatedly asked Churchville to pay down the margin balance and invest in other securities.  In April 2012, Oppenheimer demanded repayment of the margin loan.  Because Churchville and ClearPath had used the OPCO investors' investments as the collateral for the loan of approximately $4.1 million, OPCO was entitled to, and did, collect repayment directly from the U.S. Treasury bond investments in the main OPCO accounts, when those bonds matured.  In other words, Churchville and ClearPath obtained money from the OPCO investors by representing that their money would be invested in a balanced portfolio of publicly traded securities, but instead invested in low-risk government bonds, borrowed $4.1 million of that investment, and stuck the investors with the bill.  Once the loan was repaid, only $585,000 was left in the OPCO account.

65.     To compound the fraud, on or about October 2, 2012, Churchville and ClearPath then transferred the $585,000 that remained in the OPCO account, through a series of intermediate accounts, to an entirely different fund, the HCR Value Fund.  After transferring the OPCO investors' money to a fund in which they were not invested, Churchville then used that money to make payments on an entirely different investment.

66.     Even after there was no money remaining in the OPCO accounts and the accounts were closed, Churchville and ClearPath lulled certain investors by falsely representing that their Oppenheimer investment still existed and that they had not received their return on investment because it was "pending liquidation."

67.     Through a series of false and misleading accounting entries on ClearPath's ledgers, Churchville and ClearPath concealed the misappropriation of $2.5 million of OPCO

16

investor funds for the purchase of Churchville's house and the misappropriation of $1.6 million of OPCO investor funds for transfer to another .  In this way, Churchville and ClearPath concealed their misappropriation of OPCO Series funds from ClearPath employees, accountants, fund administrators, and fund investors.

68.     Unlike the other Series investments it managed, ClearPath maintained an entirely separate general ledger for the OPCO Series investment.  The 2012 general ledger for MSF I does not include any reference to OCPO.  In other words, ClearPath kept the accounting entries for the OPCO Series off the books of MSF I.  Additionally, ClearPath and Churchville made no accounting entries reflecting the loan against the OPCO Series investments.

69.     In January 2013, Churchville and ClearPath paid more than $1 million to the family members of one investor who had been asking a series of questions about the disposition of the OPCO Series investment.  As there were insufficient funds left in the OPCO accounts to cover this payment, Defendants funded this distribution by using monies that were owed to investors in other Series.

70.     In January 2013, Churchville and ClearPath paid $1.4 million in purported distributions to OPCO Series investors, which payments were funded directly from proceeds of the redemption of an entirely unrelated Series investment (the Feingold O'Keeffe Series, described below).

### iv.     Defendants Used Investor Money to Obtain a Loan Which They Used to Fund Investments on their Own Behalf

71.     MSF I included a Series investment in the Feingold O'Keeffe Distressed Loan Fund, LP (the "Feingold O'Keeffe Series"), a fund managed by a Boston-based asset

management firm that offers investments in alternative asset markets. This investment was MSF I's largest, representing more than half of MSF I's assets.

72.     In November 2011, ClearPath applied for a line of credit from Commerce Bank, based in Worcester, Massachusetts. The loan was secured by the Feingold O'Keeffe Series in MSF I, as well by as the MSF I itself.

73.     In January 2012, Churchville caused ClearPath to draw $3.75 million from the line of credit, and to deposit that money in a newly-opened Commerce Bank account in the name of MSF I.

74.     Immediately after Defendants had drawn on the line of credit, Churchville and ClearPath used the funds to make two investments in healthcare receivables totaling $3.5 million. Churchville then caused ClearPath to transfer $250,000 to a new bank account in the name of MSF II, and to send $245,000 from that account to invest in the Incubator Fund. ClearPath and Churchville did not record any accounting entries to reflect the loan, the loan proceeds, or the investments funded by the loan proceeds on the books and records of MSF I, MSF II, or ClearPath. These investments were kept off the books, presumably so that Defendants would be in a position to reap the profits for themselves if the value of the investments went up.

75.     Neither Churchville nor ClearPath disclosed to Feingold O'Keeffe Series investors the existence of the line of credit secured by the investors' assets. Nor did they disclose to investors that $3.75 million had been drawn on the line of credit and used to fund investments for the benefit of Churchville and ClearPath.

76.     Churchville and ClearPath used fraudulent and misleading accounting to conceal the existence of the line of credit, the proceeds, and the healthcare receivables investment made with the cash, including:

    a.  The general ledgers for MSF I and MSF II did not reflect any transactions in January 2012 for the Commerce Bank accounts. In fact, the general ledgers reflected no transactions related to these bank accounts until October2012;

    b.  In August 2012, Churchville and ClearPath caused the remaining cash in the Commerce Bank accounts for MSF I and MSF II to be transferred to a separate Commerce Bank account in the name of ClearPath.  By doing so, Defendants ensured that anyone (such as an auditor, accountant, or fund administrator) reviewing the bank statements would believe the accounts had been opened in October 2012, masking the existence of the prior receipt of loan proceeds;

    c.  ClearPath itself paid the interest on the Commerce Bank loan, even though the loan was in the name of MSF I, to further conceal the existence of the loan from fund administrators and accountants; and,

    d.  No accounting records for MSF I reflect the line of credit, and MSF I general ledgers and trial balances do not reflect the use of $3.5 million to fund the two healthcare receivables entities investments.

77.     By year-end 2012, the Feingold O'Keeffe Series investments had produced substantial gains.  Churchville and ClearPath instructed Feingold O'Keeffe to liquidate all Fund investments, and approximately $10 million was sent to the Commerce Bank MSF I bank

account.  A substantial portion of the proceeds from the final redemption appears to have been diverted to uses other than paying investors the returns owed to them.

78.     ClearPath and Churchville used approximately $3.8 million from the Feingold O'Keeffe Series redemption to repay the Commerce Bank loan; they used $1.8 million to fund distribution payments for the OPCO Series investors; and they transferred at least $1.7 million to other ClearPath-managed funds.

79.     None of these uses of the redemption proceeds were disclosed to investors or authorized in any way by the limited partnership agreements investors had signed to invest in the Feingold O'Keeffe Series.

80.     In sum, ClearPath put the Feingold O'Keeffe Series assets at risk by using them as collateral for a loan, undisclosed to Series investors.  Churchville caused ClearPath to use the loan for ClearPath itself; then repaid the loan using money that belonged to investors in the Feingold O'Keeffe Series investment.

###### v.     Defendants Continued to Divert Money from Redeemed Investments to Investments for Their Own Benefit

81.     Between May 2011 and October 2011, Churchville and ClearPath raised money for a second round of investments in the Managed Futures Series.

82.     In August and September of 2012, Churchville and ClearPath caused approximately 80% of the Managed Futures investment to be redeemed, yielding approximately $3.6 million.

83.     Instead of paying this $3.6 million to Managed Futures Series investors, Defendants only distributed approximately $1.7 million to Managed Futures investors, and used the remaining proceeds to make improper payments including:  (a) approximately $1.1 million to

another Incubator Fund investment; (b) approximately $392,000 to pay distributions to investors in an unrelated MSF III series investment; and (c) $400,000 to the HCR Value fund, which was not allocated to any Managed Futures investor.   These payments were without authorization or disclosure to Series investors, and were contrary to the representations made to Series investors.

### vi.    Additional Fraudulent Transactions

84.    ClearPath and Churchville continued their scheme by regularly commingling investor contributions and distributions across Series, in violation of the LPAs for the Funds.

85.    In order to silence inquisitive or concerned investors, ClearPath and Churchville made proportionally larger payments to certain investors who raised questions regarding the disposition of their investments.  Recipients of these larger distributions included both a Churchville family member and a long-term investor who had complained to Rhode Island securities regulators about Churchville's treatment of the investor's private advisory account.

86.    Throughout the course of their scheme, Churchville and ClearPath caused false and misleading entries to be created in ClearPath and the Funds' accounting records.  This misleading accounting allowed Defendants to conceal their fraudulent scheme from ClearPath staff, fund auditors, accountants, and fund administrators.

87.    ClearPath and Churchville also made unauthorized transfers of investor money from the Funds to fund HCR Value.   Between September 26, 2012 and May 3, 2013, Defendants paid approximately $3.7 million into the HCR Value fund.

### vii.   Defendants' Fraudulent Scheme Netted Defendants Substantial Cash at the Expense of Their Investors

88.     In sum, Defendants misappropriated and misallocated over $11 million in investor money, as reflected in the Defendants' own documents.

89.     By engaging in the conduct described above, ClearPath and Churchville misappropriated at least $6 million for ClearPath's and Churchville's personal uses, including $2.5 million stolen from investors to purchase Churchville's house and $3.5 million stolen from investors to make investments for the benefit of ClearPath itself.

90.     As a result of Defendants' misappropriation and commingling of investors' money for their personal and business uses, Defendants caused at least $11 million dollars in investor losses.

## C.  DEFENDANTS CONTINUALLY MADE FRAUDULENT MISREPRESENTATIONS TO PERPETUATE THEIR SCHEME

91.     Defendants' fraudulent scheme depended on a stream of fraudulent misrepresentations and material omissions in their communications with investors concerning what Defendants had actually done with the investors' money.

92.     Defendants made constant fraudulent misrepresentations and material omissions to investors and potential investors regarding the use of the money that investors had entrusted to them.  Those misrepresentations included, but were not limited to:

> a.  In August 2011, potential investors in the OPCO Series were told that the investment would be a balanced portfolio and were provided materials reflecting a strategy of investment in public equities and corporate bonds.  In

reality, this strategy was never implemented.  Defendants invested the money

in government bonds and borrowed against the bonds for their own purposes.

b.  Starting in December 2010, ClearPath and Churchville sent investors capital

account statements that omitted to disclose that their accounts had been

diminished or encumbered by the use of their assets for purposes unrelated to

them.  Nor did the capital account statements reflect that certain of the

investments had been redeemed.

c.  At no time prior to 2014 did the Defendants tell Feingold O'Keeffe Series

investors that their investment money had been used to repay the Commerce

Bank line of credit or that they had borrowed against the OPCO Series

investment.

93.     Defendants misrepresented the status of various Series investments.  Those

misrepresentations included, but were not limited to:

a.  In early 2013, an investor sought to redeem his investments and move from

ClearPath to a new adviser.  For months thereafter, Defendants provided a

variety of excuses, while omitting to tell the investor that his money had

actually been diverted for other purposes.

b.  In October 2013, an investor emailed Churchville regarding the location and

status of his investments.  Churchville replied that the money was "at the

companies."  In reality, the Series investments at issue had been fully

redeemed months before and the proceeds had been dissipated by the

Defendants.  Churchville made similar comments regarding other investments

throughout 2013.  These statements, and those like them, were designed to lull investors into believing that their investments were safe.

94.     ClearPath and Churchville also made misstatements stemming from the loss of Series investments in loans the Funds made to healthcare receivables vehicles.  The vehicles were alleged to have been involved in a Ponzi scheme. Investors in this scheme suffered losses totaling approximately $23 million.

95.     Not until September 2013, when the principals of the healthcare receivables investments were indicted, did Churchville notify investors of these losses.  At that time, investors began to request that Defendants return what remained of their assets.

96.     Because Defendants themselves had been misappropriating investor money, they were unable to return the requested money to their investors when asked.  Defendants deflected those requests through a series of misrepresentations about why they could not then give investors back their money.

97.     Beginning at the end of the 2013, Defendants proposed that investors enter a "distribution plan" under which Churchville and ClearPath would repay investors.  In communications to investors about the distribution plan, Defendants continued to make misrepresentations and fraudulent omissions about the nature and cause of the shortfall in funds. This series of fraudulent misrepresentations and omissions were designed by Defendants to keep investors from discovering the nature and extent of Defendants' fraud and to lull the investors and dissuade the investors from seeking legal redress or reporting Defendants to the authorities.

98.     For instance, on February 4, 2013, a ClearPath officer sent a memorandum to ClearPath investors.  This letter blamed a part of the losses on Defendants' poor "fund administration."  However, Defendants also continued to misrepresent the nature of the losses.

24

For instance, Defendants misrepresented that "a number of investments did not produce returns (such as "OpCo")" which was untrue.  The letter also stated that, "the Funds' principal lending bank terminated the lines of credit that were previously used to fund recurring cash flow needs, investor payouts, and other liquidity needs of the Funds…," when, in reality, Defendants had used the Commerce Bank loan to invest for ClearPath's benefit, and had used Feingold O'Keeffe Series redemptions to repay the loan.  The memorandum also fraudulently omitted that the main reason that the Funds could not pay the liquidation demands of investors was because Defendants' had stolen investors' money and had also used investors' money to fund Defendant's own investments.

## D.  RELIEF DEFENDANTS RECEIVED INVESTORS FUNDS DERIVED FROM THE UNLAWFUL ACTS OR PRACTICES OF THE DEFENDANTS.

99.     MSF I received funds derived from Defendants' fraudulent scheme.  Between October 2009 and October 2014, there were 38 transfers of cash between MSF I and the other Multi-Strategy funds or the HCR Value Fund.

100.    Several of these transfers related to the unauthorized diversion of investment redemptions or loan proceeds, including the transfer of $1.2 million to the MSF III fund on January 30, 2013, sourced from the prior day's Feingold O'Keeffe redemption.  This transfer reimbursed MSF III for a $1.2 million transfer to HCR Value it had improperly made on behalf of MSF I in October 2012, which, in turn, was funded by the redemption of Managed Futures investment.

101.    In addition, according to accounting documents prepared by the fund administrator for ClearPath's Funds, MSF I held unallocated investments for the benefit of the Defendants totaling approximately $1.5 million as of December 31, 2014.  These unallocated

investments were principally funded by diverting redemptions or loan proceeds from unrelated investments, monies which properly belonged to the particular Limited Partners who had invested in the Series investments at issue.

102.     MSF II received funds derived from Defendants' fraudulent scheme.  Between January 2012 and April 2014, there were 12 transfers of cash between MSF II and the other Multi-Strategy funds or the HCR Value Fund.

103.     Several of these transfers related to the unauthorized diversion of investment redemption or loan proceeds, including the $250,000 transfer received from MSF I on January 5, 2012 which was funded from the Commerce Bank loan proceeds using MSF I assets as collateral.  This specific transfer, which was used to fund an investment in the Incubator Fund, was never recorded in the books and records for MSF I or MSF II.

104.     In addition, according to accounting documents prepared by the fund administrator for ClearPath's Funds, MSF II held unallocated investments for the benefit of the Defendants totaling approximately $123,000 as of December 31, 2014.  These unallocated investments were principally funded by diverting redemptions or loan proceeds from unrelated investments, monies which properly belonged to the particular Limited Partners who had invested in the Series investments at issue.

105.     MSF III received funds derived from Defendants' fraudulent scheme.  Between October 2009 and September 2013, there were 24 transfers of cash between MSF III fund and the other Multi-Strategy funds or the HCR Value Fund.

106.     Several of these transfers related to the unauthorized diversion of investment redemption or loan proceeds, including the two transfers of $1.2 million referenced above.  In October 2012, MSF III transferred $1.2 million of cash sourced from the redemption proceeds of

Managed Futures Series to the HCR Value Fund on behalf of MSF I.  In January 2013, MSF I reimbursed MSF III for this inter-fund loan using proceeds from the redemption of the Feingold O'Keeffe Series.

107.    In addition, according to accounting documents prepared by the fund administrator for ClearPath's Funds, MSF III held unallocated investments for the benefit of the Defendants totaling approximately $1.1 million as of December 31, 2014.  These unallocated investments were principally funded by diverting redemptions or loan proceeds from unrelated investments, monies which properly belonged to the particular Limited Partners who had invested in the Series investments at issue.

108.    The HCR Value Fund received funds derived from Defendants' fraudulent scheme.  Between September 2012 and October 2014, there were 35 transfers of cash between HCR Value Fund and the Multi-Strategy Funds.

109.    Specifically, the Multi-Strategy funds were the primary sources of initial funding for the HCR Value Fund which was established in 2012.  Between September 26, 2012 and May 3, 2013, the Multi-Strategy funds contributed $3.7 million to the HCR Value Fund.

110.    Several of these transfers were funded by the unauthorized diversion of investment redemption or loan proceeds, including the transfer of $1.2 million received from MSF III in October 2012 which was funded from the Managed Futures Series redemption.

## FIRST CLAIM FOR RELIEF

### ClearPath and Churchville's Fraud in the
### Purchase or Sale of Securities in Violation of
### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

111.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-110 above as if set forth fully herein.

112.    As detailed above, Defendants engaged in a fraudulent scheme through a Series of fraudulent acts, statements, and material omissions through which investor funds were misappropriated for the Defendants' personal and business uses.

113.    By engaging in the conduct described above, Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

114.    Defendants' conduct involved fraud, deceit, manipulation, and/or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in substantial losses to other persons.

115.    As a result, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## SECOND CLAIM FOR RELIEF

**ClearPath and Churchville's Fraud in the Offer or Sale of Securities
In Violation of Section 17(a) of the Securities Act**

116.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1-115 above as if set forth fully herein.

117.    Defendants, directly and indirectly, acting intentionally, knowingly, recklessly, in

the offer or sale of securities by the use of the means or instruments of transportation or

communication in interstate commerce or by the use of the mails:  (a) have employed or are

employing devices, schemes or artifices to defraud; (b) have obtained or are obtaining money or

property by means of untrue statements of material fact or omissions to state material facts

necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading; or (c) have engaged or are engaging in transactions, practices or

courses of business which operate as a fraud or deceit upon purchasers of the securities.

118.    As a result, Defendants have violated and, unless enjoined, will continue to

violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## THIRD CLAIM FOR RELIEF

**ClearPath and Churchville's
Fraudulent Conduct by an Investment Adviser in
Violation of Section 206(1) and 206(2) of the Advisers Act**

119.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1-118 above as if set forth fully herein.

120.    At all relevant times, Patrick Churchville and ClearPath were "investment

advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-

2(a)(11)] .  ClearPath and Churchville each were in the business of providing investment advice

29

concerning securities for compensation.   Churchville was also an investment adviser due to his

ownership, management and control of ClearPath.

121.   As set forth above, Churchville and ClearPath misappropriated money from their

advisory clients through a scheme to defraud and through transactions, practices, and courses of

business which operated as a fraud or deceit upon their advisory clients.

122.   Churchville and ClearPath, by use of the mails or any means or instrumentality of

interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly:  (a)

have employed or are employing devices, schemes, or artifices to defraud clients and/or potential

clients; or (b) have engaged or are engaging in transactions, practices, or courses of business

which operate as a fraud or deceit upon a client or prospective client.

123.   As a result, Churchville and ClearPath have violated and, unless enjoined, will

continue to violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §80b-6(1) & (2)].


### FOURTH CLAIM FOR RELIEF

**ClearPath and Churchville's Fraudulent Conduct
as an Investment Adviser to a Pooled Investment Vehicle in
Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder**

124.   The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 123 above as if set forth fully herein.

125.   At all times relevant to this Complaint, the Defendants acted as investment

advisers to the ClearPath Funds, a pooled investment vehicle as defined in Rule 206(4)-8(b) [17

C.F.R. § 275.206(4)-8(b)].

126.   Defendants, while acting as investment advisers to pooled investment vehicles, by

use of the mails, and the means and instrumentalities of interstate commerce, directly or

indirectly, engaged in acts, practices, or courses of businesses which were fraudulent, deceptive or manipulative.  The Defendants made untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in the pooled investment vehicles, and otherwise engaged in acts, practices, or courses of businesses that were fraudulent, deceptive or manipulative with respect to investors or prospective investors in the pooled investment vehicles.

127.    By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-8 thereunder [15 C.F.R. 275.206(4)-8].

### FIFTH CLAIM FOR RELIEF

**ClearPath's Violation of**
**Section 206(4) of the Advisers Act and Rule 206(4)-2 Thereunder**

128.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 127 above as if set forth fully herein.

129.    In 2011, ClearPath was an investment adviser required to be registered or required to be registered under Section 203 of the Advisers Act [15 U.S.C. § 80b-3].

130.    In 2011, by using the mails or means or instrumentalities of interstate commerce, directly or indirectly, while acting as an investment adviser, ClearPath had custody and control over the Funds' assets.

131.    During 2011 or thereafter, the Funds never underwent a surprise annual examination by an independent accountant nor did ClearPath provide investors with audited financial statements.

132.    By engaging in the conduct described above, ClearPath directly and indirectly violated, and unless enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R § 275.206(4)-2].

### SIXTH CLAIM FOR RELIEF

**Churchville Aided and Abetted ClearPath's**
**Violation of Section 206(4) of the Advisers Act and Rule 206(4)-2 Thereunder**

133.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 132 above as if set forth fully herein.

134.    In 2011, ClearPath was an investment adviser required to be registered or required to be registered under Section 203 of the Advisers Act [15 U.S.C. § 80b-3].

135.    In 2011, by using the mails or means or instrumentalities of interstate commerce, directly or indirectly, while acting as an investment adviser, ClearPath had custody and control over the Funds' assets.

136.    During 2011 or thereafter, the Funds never underwent a surprise annual examination by an independent accountant nor did ClearPath provide investors with audited financial statements.

137.    Churchville knew or recklessly disregarded that ClearPath's conduct was improper and knowingly rendered to ClearPath substantial assistance in this conduct.

138.    As a result, Churchville aided and abetted, and unless enjoined will continue to aid and abet, ClearPath's violation of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R § 275.206(4)-2].

## SEVENTH CLAIM FOR RELIEF

### ClearPath's Violation of
### Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder

139.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 138 above as if set forth fully herein.

140.     At all relevant times, ClearPath was an investment adviser, within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), to the Funds.

141.     ClearPath used an off-the-rack compliance manual that was not customized to ClearPath's business.  For instance, it did not contain any policies or procedures concerning the management of private funds.

142.     By engaging in the conduct described above, acting intentionally, recklessly, and/or negligently, ClearPath provided investment advice to its clients without adopting and implementing written policies and procedures reasonably designed to prevent violation, by ClearPath and ClearPath's supervised persons, of the Advisers Act and the rules promulgated under the Advisers Act.  Nor did ClearPath engage in annual review of such policies and procedures.

143.     By reason of the foregoing, ClearPath violated, and unless enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R § 275.206(4)-7].

## EIGHTH CLAIM FOR RELIEF

**Churchville Aided and Abetted ClearPath's**
**Violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder**

144.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 143 above as if set forth fully herein.

145.    At all relevant times, ClearPath was an investment adviser, within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), to the Funds.

146.    ClearPath used an off-the-rack compliance manual that was not customized to ClearPath's business.  For instance, it did not contain any policies or procedures concerning the management of private funds.

147.    By engaging in the conduct described above, acting intentionally, recklessly, and/or negligently, ClearPath provided investment advice to its clients without adopting and implementing written policies and procedures reasonably designed to prevent violation, by ClearPath and ClearPath's supervised persons, of the Advisers Act and the rules promulgated under the Advisers Act.  Nor did ClearPath engage in annual review of such policies and procedures.

148.    Churchville knew or recklessly disregarded that ClearPath's conduct was improper and knowingly rendered to ClearPath substantial assistance in this conduct.

149.    As a result, Churchville aided and abetted, and unless enjoined will continue to aid and abet, ClearPath's violation of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R § 275.206(4)-7].

## NINTH CLAIM FOR RELIEF

### Other Equitable Relief, Including Unjust Enrichment and Constructive Trust
### (Relief Defendants)

150.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-149 above as if set forth fully herein.

151.    Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] states:  "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

152.    The Relief Defendants have received investors funds derived from the unlawful acts or practices of the Defendants under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds.

153.    Further, specific property acquired by the Relief Defendants is traceable to Defendant's wrongful acts and there is no reason in equity why the Relief Defendants should be entitled to retain that property.

154.    As a result, the Relief Defendants are liable for unjust enrichment and should be required to return their ill-gotten gains, in an amount to be determined by the Court.  The Court should also impose a constructive trust on property in the possession of the Relief Defendants that is traceable to Defendants' wrongful acts.

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.    Enter a preliminary injunction, order freezing assets, and order for other equitable

relief in the form submitted with the Commission's motion for such relief;

B.      Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]; Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Sections 206(1), (2), and (4) of the Advisers Act [15 U.S.C. §80b-6(1), (2), & (4)] and Rules 206(4)-2, 206(4)-7, and 206(4)-8 thereunder [[17 C.F.R § 275.206(4)-2, -7, & -8].

C.      Enter an order permanently restraining and enjoining Churchville from participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account;

D.      Require Defendants to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

E.      Require the Relief Defendants to disgorge all unjust enrichment and/or ill-gotten gain received from Defendants, plus prejudgment interest, with said moneys to be distributed in accordance with a plan of distribution to be ordered by the Court;

F.      Require Defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)];

G.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered;

H.      Appoint a receiver over Defendants and Relief Defendants pursuant to Federal

Rule of Civil Procedure 66;

I.      Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Marc J. Jones_____
Marc J. Jones (Massachusetts Bar No. 645910)
   Senior Trial Counsel
Cynthia Storer Baran
   Senior Enforcement Counsel
Emily R. Holness
   Enforcement Counsel
Martin F. Healey
   Regional Trial Counsel

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8947 (Jones direct)
(617) 573-4590 (fax)
jonesmarc@sec.gov (Jones email)

DATED:  May 7, 2015